UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH PAUL PASTORINO,

No. 15-10918

Plaintiff,

District Judge Denise Page Hood
Magistrate Judge R. Steven Whalen

v.

COMMISSIONER OF
SOCIAL SECURITY,

Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Joseph Paul Patorino ("Plaintiff") brings this action under 42 U.S.C.

§405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying his

application for Supplemental Security Income ("SSI") under the Social Security Act.   The

parties have filed cross motions for summary judgment which have been referred for a

Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).   For the reasons set forth

below, I recommend that Defendant's Motion for Summary Judgment [Docket #20] be

GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #17] be DENIED.

## I.   PROCEDURAL HISTORY

Plaintiff applied for SSI on February 26, 2010, alleging disability as of November 1,

2009 (Tr. 167).   Upon initial denial of the claim, Plaintiff requested an administrative

hearing, held on October 4, 2011 in Flint, Michigan before Administrative Law Judge

("ALJ") Andrew G. Sloss (Tr. 62).  On October 24, 2011, ALJ Sloss found that Plaintiff did not experience any conditions creating work-related limitations (Tr. 68).  On March 13, 2013, the Appeals Council remanded the case to ALJ Sloss for consideration of newer evidence (Tr. 73).  Contrary to ALJ Sloss' finding, the Appeals Council also found that the evidence showed that the conditions of bipolar disorder and obsessive-compulsive disorder created some degree of work-related limitation (Tr. 73).

ALJ Sloss held a second hearing on August 9, 2013 (Tr. 18, 459).  Plaintiff, represented by attorney Matthew F. Taylor testified (Tr. 462-470), as did Vocational Expert ("VE") Pauline Mceackin (Tr. 470-473).  On August 19, 2013, ALJ Sloss found that Plaintiff was capable of a significant range of unskilled work (Tr. 22, 28).

On January 30, 2015, the Appeals Council declined to review the administrative decision (Tr. 1-3).  Plaintiff filed suit in this Court on March 12, 2015.  *Docket #1.*

## II.  BACKGROUND FACTS

Plaintiff, born August 17, 1960, was 53 at the time of the latest administrative decision (Tr. 28, 167).  He left school after 10th grade (Tr. 188).  He alleges disability as a result of Bipolar disorder, Obsessive Compulsive Disorder ("OCD"), and foot problems (Tr. 187).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

### 1.  October 4, 2011 Hearing

Plaintiff left school after 10th grade and did not receive vocational training (Tr. 36). During his school years, he had been placed in special education (Tr. 41). He had trouble in Math and his mathematical skills stopped at multiplication (Tr. 41). He was able to drive (Tr. 36). He was unable to work due to a ruptured spinal disc and another bulging disc (Tr. 37). He was unable to stand for more than 10 minutes due to severe pain (Tr. 37). He took Aleve (Tr. 38).

Plaintiff experienced OCD, characterized by the need to wash his hands continuously and organizing his clothes in a consistent way (Tr. 38). He had received counseling and psychiatric treatment and was currently taking medication for OCD (Tr. 39). He also experienced bipolar disorder, characterized by racing thoughts and mood swings (Tr. 39). As a teenager, his job as a newspaper deliverer took "four or five hours" due to his compulsion to arrange the newspapers perfectly (Tr. 42). He did not like to leave his house or be around other people (Tr. 39). He also experienced anxiety and left the house only to attend doctor's appointments or check the mail (Tr. 42). He denied having friends (Tr. 43). Memory problems required him to write himself notes (Tr. 43). He had two adult children and in March, 2010 married a woman he met at church (Tr. 39). He denied problems with the law (Tr. 39-40).

Plaintiff's household activities were limited to preparing simple meals and some vacuuming (Tr. 40, 42). He did not perform yard work and spent 70 percent of his waking hours reclining (Tr. 40). He no longer attended church because sitting in a pew caused back

pain (Tr. 40).

## 2. August 9, 2013 Hearing

Plaintiff's back condition had worsened since the last hearing (Tr. 462). He had health insurance but it did not "cover very much" (Tr. 483). He took Lortab 725 and Neurontin for back pain (Tr. 463). He saw a therapist and psychiatrist on a monthly basis (Tr. 463).

He experienced continuous back pain and occasional shooting left leg pain and leg weakness every one to two days (Tr. 463). Back pain required him to recline twice a day for 60 to 90 minutes (Tr. 464). He experienced anxiety attacks "all the time," noting that the attacks were precipitated by "being around people" (Tr. 465). His anxiety attacks were characterized by shortness of breath, racing pulse, and sweating (Tr. 466). Due to OCD, he re-cleaned dishes and countertops "five to six times" in a row (Tr. 467). Leg cramps caused intermittent sleep disturbances (Tr. 467-468). He left the house a maximum of two to three times a week (Tr. 468). He lacked the concentrational abilities to read for long periods (Tr. 469).

## 1. Records Related to Plaintiff's Treatment

In March, 2009, Plaintiff sought treatment for hypertension (Tr. 275). He reported stress due to the recent death of his father (Tr. 275). Nurse Practitioner ("NP") Lisa Lindsay remarked that Plaintiff should be "weane[d] off Xanax" (Tr. 275). September, 2009 psychological intake records note Plaintiff's report of long-term symptoms of OCD in which

he had to "have everything perfect" (Tr. 253-254). Plaintiff reported a good relationship with his mother, two adult children, and brother (Tr. 255). He reported former alcohol abuse but had not used alcohol in the last 19 years (Tr. 255). He appeared well groomed, cooperative, and calm with "pressured" speech (Tr. 256). Intake notes state that his thought process was intact but that he had trouble staying "on topic" (Tr. 256). He appeared fully oriented and denied hallucinations (Tr. 256). He reported that his inability to overcome OCD caused anxiety (Tr. 257). Social worker Matthew Marx assigned Plaintiff a GAF of 58[1] (Tr. 260). Records from a November, 2009 psychiatric evaluation by Duncan Magoon, M.D., state that Plaintiff reported symptoms of bipolar disorder from the age of six to sixteen and had since lost two jobs because he performed too slowly (Tr. 264). He reported that he was "essentially . . . housebound" as a result of his psychological problems (Tr. 266). Dr. Magoon prescribed Depakote (Tr. 266). The same month, NP Lindsay noted Plaintiff's report of a "faint twinge" in the left chest and shoulder (Tr. 277). He denied extremity weakness (Tr. 277). In December, 2009, Dr. Magoon assigned Plaintiff a GAF of 49[2] (Tr. 270).

In January, 2010, NP Lindsay noted Plaintiff's complaint of rib pain (Tr. 279).

---

[1]

A GAF score of 51-60 indicates moderate symptoms OR moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders-- Text Revision* ("*DSM-IV-TR*"), 34 (4th ed. 2000).

[2]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM-IV-TR* at 34.

-5-

Plaintiff reported that he felt a "pop" upon attempting to lift an object (Tr. 279).  Imaging studies were negative for a rib fracture (Tr. 285).  NP Lindsay's May, 2010 notes state that Plaintiff reported dizziness but did not mention back pain (Tr. 307).  In October, 2010, Plaintiff denied medication side effects, muscle pain, or joint pain (Tr. 309).  In November, 2010, psychiatrist Michael Gotlib, M.D. assigned Plaintiff a GAF of 65[3] (Tr. 329).   April, 2011 therapy notes state that his mother and wife were "natural supports" (Tr. 334).  The following month, Plaintiff reported that his overall health was "good" and that he coped with back pain by taking Aleve (Tr. 335-336).  He reported good results from the current bipolar medication (Tr. 334).  NP Lindsay's June, 2011 treating records note Plaintiff's denial of side effects or physical or psychological "symptoms" (Tr. 311).  A CT of the abdomen was unremarkable abnormality of the urinary bladder (Tr. 313).  Notes from the following month state that Plaintiff was "doing fine" (Tr. 314).  Plaintiff's anxiety was deemed "stable" (Tr. 315).

   August, 2011 medication review notes by Dr. Gotlib state that Plaintiff exhibited a normal mood and did not have problems walking short distances  (Tr. 340).  Plaintiff reported that the prescribed psychotropic medication was "working" (Tr. 346).  Dr. Gotlib assigned Plaintiff a GAF of 65 (Tr. 342).   The same month, Plaintiff's therapist found that he was moderately limited in the ability to carry out detailed instructions, maintain attention

---

[3]

   GAF scores in the range of 61-70 indicate "some mild [psychological] symptoms or some difficulty in social, occupational, or school functioning." *DSM-IV-TR* at 32.

-6-

for extended periods, sustain an ordinary routine without special supervision, or work in coordination with others (Tr. 349). She found that Plaintiff experienced marked limitation in the ability to complete a work period without interruption from psychologically based symptoms (Tr. 349).

A September, 2011 EMG study showed mild radiculopathy of the lower left extremity (Tr. 401). An October, 2011 CT of the lumbar spine showed moderate disc space narrowing at L4-L5 with a central disc protrusion (Tr. 351). The following month, NP Lindsay noted Plaintiff's denial of radiating lower extremity pain (Tr. 404-406). NP Lindsay's December, 2011 records state that Plaintiff had not experienced recent symptoms (Tr. 407).

In February, 2012, NP Lindsay noted Plaintiff's complaints of nighttime muscle spasms of the left leg (Tr. 410). The following month, NP Lindsay observed a normal gait, station, and range of motion (Tr. 415). Imaging studies of the cervical spine were unremarkable (Tr. 418). In April, 2012, Plaintiff reported that he had been "doing fine" (Tr. 419). He reported concern regarding "cancer in his throat," but nonetheless indicated that he was not ready to quit smoking (Tr. 419). In June, 2012, Dr. Magoon performed a psychiatric evaluation, noting that Plaintiff had done "quite well" on medication for the past two years and was now "not as housebound" as before beginning treatment (Tr. 352-357). NP Lindsay's August, 2012 notes state that Plaintiff denied current symptoms and the following month, indicated that he had been "doing fine" (Tr. 426, 428). In October, 2012 pulmonologist Geeta D. Rode, M.D. found that Plaintiff, a 35-year smoker, had mild

chronic obstructive pulmonary disease (Tr. 390). She prescribed Advair and albuterol on an as-needed basis (Tr. 391). NP Lindsay's notes from the same month state that Plaintiff denied recent symptoms (Tr. 430). November, 2011 treating notes state that Plaintiff was "doing fine" (Tr. 432). In December, 2012, Plaintiff reported continued back pain but denied radiating pain, tingling, or numbness (Tr. 435).

January, 2013 treating notes state that Plaintiff was "doing fine" and that anxiety attacks were less frequent due to current medication (Tr. 438). March, 2013 treating records show similar findings (Tr. 443). In April, 2013, Plaintiff reported that he felt "great" (Tr. 366). Dr. Magoon noted that Plaintiff's psychological symptoms were "under good control with medication" (Tr. 368). The following month, Dr. Rode noted Plaintiff's report that respiratory symptoms were better as well as his acknowledgment that he continued to smoke a half pack of cigarettes each day (Tr. 395).

The following month, NP Lindsay completed a work-related activity assessment, finding that Plaintiff was limited to carrying five pounds; standing and walking for a total of four hours in an eight-hour workday (one hour without interruption); and sitting for four (one hour without interruption) (Tr. 446). She found that Plaintiff was precluded from all climbing, crouching, kneeling, and crawling, and was limited to occasional balancing, stooping, reaching, handling, and pushing or pulling (Tr. 447). She found additionally that Plaintiff experienced environmental restrictions involving heights, moving machinery, temperature extremes, chemicals, dust/fumes, and humidity (Tr. 447). She found that

-8-

Plaintiff's pain would cause concentrational problems and that he would require several unscheduled work breaks each day (Tr. 448). She found that Plaintiff would typically miss five days of work each month due to the conditions of COPD, chronic back pain, and anxiety (Tr. 448). NP Lindsay found that Plaintiff's condition was currently "stable" but would "continue to deteriorate over time" (Tr. 448).

NP Lindsay's treating notes from the following week state that Plaintiff had a cough with phlegm but was "doing fine" and had "been feeling good as well" (Tr. 449). He reported back pain when his medication wore off, but denied radiating pain into the lower extremities (Tr. 449). NP Lindsay's notes from the following month state that Plaintiff reported worsening depression in "the past few weeks" (Tr. 452). The same month, an MRI of the lumbar spine showed "some effacement of the fat about the exiting left L4 nerve root but no nerve root impingement (Tr. 457). He was diagnosed with "mild to moderate" stenosis at L4-L5 (Tr. 458).

### 2. Non-Treating Sources

In May, 2010, Matthew P. Dickson, Ph.D. performed a consultative psychological evaluation on behalf of the SSA, noting Plaintiff's report of lifelong OCD and bipolar disorder (Tr. 287). Plaintiff admitted to former alcohol abuse and abusing Fioricet until 2009 (Tr. 287). Plaintiff reported that he spent most of his time with his wife and mother (Tr. 288). He indicated that on a typical day, he would watch television, read, and straighten "things up" (Tr. 288).

-9-

Dr. Dickson noted that while Plaintiff alleged that he sometimes went for days without changing clothes or showering, he appeared appropriately groomed (Tr. 288). Dr. Dickson noted that Plaintiff was able to count money, pay bills, and travel to appointments unaccompanied (Tr. 288). Dr. Dickson remarked that Plaintiff "was reluctant to admit any capabilities" (Tr. 288). He found that Plaintiff "exaggerated symptoms . . . and under-represented his functioning ability" (Tr. 288). He noted that Plaintiff "conveyed an attitude of helplessness, which seemed exaggerated" (Tr. 289).

Dr. Dickson noted that Plaintiff's mental activity was "spontaneous and organized" (Tr. 289). He noted that Plaintiff was fully oriented (Tr. 289). Dr. Sayyid administered the "Structured Inventory of Malingered Symptomatology" ("SIMS"), noting that the score was indicative of "suspected malingering" (Tr. 290). He found that Plaintiff's ability to understand, remember, and carry out instructions was moderately impaired and his ability to interact appropriately with coworkers was moderately impaired (Tr. 290). He assigned Plaintiff a GAF of 55 (Tr. 290). The same month, Rom Kriauciunas, Ph.D. completed a non-examining review of the treating records, finding that Plaintiff experienced mild limitation in activities of daily living but moderate limitation in social functioning and concentration, persistence, or pace (Tr. 51).

The following month, Samiullah Sayyid, M.D. performed a physical consultative exam on behalf of the SSA noted Plaintiff's report of cramping of the left hand and non-radiating low back pain (Tr. 293). Dr. Sayyid observed a normal gait and full range of

motion in all joints with tenderness and "some diminished movements" in the lumbar spine (Tr. 294).  Reflexes were normal in the upper extremities like and "diminished" in the lower extremities (Tr. 294).  Plaintiff exhibited some difficulty squatting and arising (Tr. 296).

### C.  Vocational Testimony

The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and lack of work experience with the following limitations:

> [L]ight work[4]  except that his psychological symptoms limit him to unskilled work . . .  and work that has only occasional interaction with the general public and coworkers (Tr. 471).

The VE responded that the individual could perform the light, unskilled work of a housekeeper (80,000 in the national economy); assembler (125,000); and packager (130,000). She testified that employers customarily limited to absences to one a month or no more than eight in a 12-month period (Tr. 471).  She stated that if Plaintiff were absent five times a month, no competitive work would be available (Tr. 471).   She stated further that if the

-----

[4]
    20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.  *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

individual required two unscheduled 60-minute breaks each day, or, worked 70 percent more slowly than average due to OCD, all competitive work would be precluded (Tr. 472). She stated that her testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT")(Tr. 471).

### D. The ALJ's Decision (August 19, 2013)

Citing the medical records, ALJ Sloss found that Plaintiff experienced the severe impairments of "degenerative disc disease bipolar disorder and [OCD]" but that none of the conditions met or medically equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 20-22). The ALJ found that Plaintiff had mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, and pace (Tr. 21). The ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [His] psychological symptoms limit him to unskilled work as defined by the Regulations, in work that has only occasional changes in the work setting, and that involves only occasional interaction with the general public and coworkers (Tr. 22).

Citing the VE's testimony, the ALJ determined that Plaintiff could work as a housekeeper, assembler, and packager (Tr. 28).

The ALJ discounted Plaintiff alleged degree of limitation (Tr. 23-27). The ALJ noted that Plaintiff received exclusively conservative treatment and that "no surgery ha[d] been performed or recommended (Tr. 23). He cited treating records by NP Lindsay and showing and normal gait and no lower extremity symptoms (Tr. 23-24).

-12-

As to the allegations of psychological limitation, the ALJ cited Dr. Dickson's consultative finding that Plaintiff exaggerated his psychological problems and was malingering based on his performance on the Structured Inventory of Malingered Symptomatology ("SIMS") (Tr. 25).  He rejected a mental health therapists findings that Plaintiff experienced "marked" limitation in the ability to complete a normal workday and workweek and perform without the need for an unreasonable number of rest periods (Tr. 26).  He noted that EMG studies showed only a mild degree of radiculopathy (Tr. 27).  The ALJ cited Dr. Magoon's finding that Plaintiff was doing well with medication (Tr. 27).

### III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health*

*& Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

-14-

## V.  ANALYSIS

Plaintiff makes three arguments in favor remand.  First, he contends that the ALJ erred by discounting NP Lindsay's May, 2013 disability opinion.  Second, he argues that the hypothetical question to the VE did not contain all of his physical or mental limitations as found by various treating and consultative sources.  Third, he faults the ALJ for declining to credit his work-related psychological limitations.

Because arguments one and three are partially dispositive of the hypothetical question argument, they will be considered first.

### A.  NP Lindsay pg 4

Plaintiff disputes the ALJ's rejection of NP Lindsay's May, 2013 opinion.  *Plaintiff's Brief,* 4-11, *Docket #17.*  He argues, in effect, that the opinion is well supported by the treating records, consultative findings, and imaging studies.  *Id.*  He contends that in essentially rejecting Dr. Lindsay's opinion, the ALJ erred by failing to consider the factors to be considered in according weight to a medical opinion such as the examining relationship, treatment relationship, supportability of the opinion, its consistency with the record as a whole, and the source's specialization.  *Id.* at 5-6; 20 C.F.R. § 416.927(c).[5]

Lindsay, a nurse practitioner, is not an "acceptable medical source"  20 C.F.R. §§ 404.1502, 404.1513(a), 416.913.  Nonetheless, her opinion "is entitled to consideration due to [her] expertise and long-term relationship" with Plaintiff.  *Cole v. As true,*  661 F.3d 931,

---

[5]Mis-cited as § 416.927(d) in Plaintiff's brief.

939 (6th Cir. 2011); 20 C.F.R. §§ 404.1513(d)(1), 416.913. In weighing the opinions of "other sources," it is "appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." SSR 06–3p, *2, 2006 WL 2329939, *2 (August 9, 2006). The Ruling notes the increasing significance of "other" medical sources in the disability determination:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

*Id.* at *4. The Ruling states further, "The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Each case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

The ALJ's conclusions regarding NP Lindsay's May, 2013 opinion do not contain procedural or substantive error. Noting that NP Lindsay was not an acceptable medical source, the ALJ nonetheless discussed the treating relationship and her treating records at length (Tr. 24) and provided multiple reasons for rejecting her opinion (Tr. 26). The ALJ observed that NP Lindsay's disability opinion stood at odds with her own treating records

-16-

showing "essentially normal physical and neurological findings" (Tr. 26). The ALJ noted that at the majority of the examinations, Plaintiff denied lower extremity symptoms (Tr. 26). He also cited EMG studies showing only "mild evidence of radiculopathy" (Tr. 26-27). The ALJ observed that surgery or other aggressive treatment had not been recommended and that Plaintiff's treatment had been uniformly conservative (Tr. 26).         My own review of the record reveals gross disparities between NP Lindsay's treating records and her May, 2013 disability opinion. Her June, 2011 records state that Plaintiff denied physical symptoms (Tr. 311). Her November and December, 2011 state that Plaintiff denied radiating pain (Tr. 404-407). In March, 2012, NP Lindsay observed a normal gait, station, and range of motion (Tr. 418). The following month, she noted that Plaintiff was "doing fine" except for his (unfounded) fear of contracting throat cancer (Tr. 419). August, October, and November, 2012 records state that Plaintiff was "doing fine," (Tr. 426, 428, 430, 435). The MRI showing the absence of lumbar nerve root impingement also supports the conclusion that Plaintiff was capable of light work. January, March, and April, 2013 describe Plaintiff's condition as "fine" or "great" (Tr. 336, 438, 443). NP Lindsay's May, 2013 finding that Plaintiff experienced disabling postural and environmental limitations due to back problems (Tr. 446-448) stands directly at odds were her treating notes from just one week later stating that Plaintiff had been "doing fine," had "been feeling good as well," and denied lower extremity pain (Tr. 449). Plaintiff reported back pain only after the pain medication "wore off" (Tr. 449).

Plaintiff faults the ALJ for alternatively giving "great weight" to Dr. Sayyid's one-time consultative finding (Tr. 26) but failing acknowledge Dr. Sayyid's observation of difficulty squatting (Tr. 296). *Plaintiff's Brief* at 9. However, the ALJ's conducted a thorough discussion of  Dr. Sayyid's findings, acknowledging Plaintiff's "diminished" reflexes in the lower extremity and "some tenderness" of the lumbar spine (Tr. 23). However, he did not err in noting that Dr. Sayyid's findings, considered in their entirety, supported the conclusion that Plaintiff could perform a full range of light work (Tr. 23). He permissibly observed that Dr. Sayyid's findings included a normal gait, posture, and stance and that Plaintiff exhibited "fine and gross dexterity" in all extremities (Tr. 23). He cited Dr. Sayyid's finding that Plaintiff was able to "get on and off the examination table without difficulty (Tr. 23, 293-294). Because substantial evidence, drawn from both Dr. Sayyid's consultative opinion and NP Lindsay's treating records support the conclusion that Plaintiff could perform a full range of light work, a remand on this basis is not warranted.

**B.  The Psychological Restrictions (Argument Three)**

Plaintiff also argues that the ALJ erred by downplaying his psychological limitations as a result of bipolar disorder and OCD. *Plaintiff's Brief* at 14-17. He notes that while the ALJ accorded great weight to the Dr. Dickson's consultative findings and Dr. Kriauciunas' non-examining conclusions, he did not acknowledge their findings of moderate psychological limitation. *Id.*

Contrary to this argument, ALJ acknowledged Dr. Kriauciunas' finding of moderate

-18-

psychological limitation, adopting the non-examining source's finding of moderate limitation in social functioning and concentration, persistence, or pace (Tr. 21). Further, while Dr. Kriauciunas found moderate concentrational limitation, he concluded (as noted by the ALJ) that Plaintiff could perform simple, low-stress, unskilled work on sustained basis (Tr. 21). Likewise, although the ALJ accepted the finding of a moderate degree of psychological limitation, he noted that the allegations of disability were undermined by Dr. Dickson's finding that Plaintiff exaggerated his psychological symptoms and test results showing that Plaintiff was malingering (Tr. 25, 288-289). The ALJ reasonably noted that while Plaintiff "conveyed an attitude of helplessness," Dr. Dickson found the subjective allegations "not credible" (Tr. 25).

Plaintiff also faults the ALJ for citing only the portions of psychiatrist Dr. Magoon's treating records. Plaintiff contends that the ALJ ought to have acknowledged Dr. Magoon's observation that Plaintiff had not been "involved in anything particularly social[ly] productive or intense." *Plaintiff's Brief* at 16 (*citing* Tr. 357). However, Dr. Magoon's observation that Plaintiff had not been socially productive cannot be interpreted to state that Plaintiff was *incapable* of a productive life; but alternatively, support Dr. Dickson's finding that Plaintiff was malingering. Likewise, Dr. Magoon's report that Plaintiff "gets easily offended by messes and avoids people and even avoids going out of the house" appears to be based on Plaintiff's allegations rather than Dr. Magoon's personal observation (Tr. 268).

Moreover, Dr. Magoon's records and the transcript as a whole easily supports the

-19-

finding that Plaintiff's symptoms of bipolar and OCD were well-managed with medication and counseling. Dr. Magoon's initial findings, made in November, 2009 (mostly on the basis of Plaintiff's description of his own condition) suggest a significant degree of psychological limitation (Tr. 264). However, November, 2010 psychiatric records show that Plaintiff experienced only mild symptoms (Tr. 329). In April, 2011, Plaintiff reported good results from his current psychotropic medication (Tr. 334). NP Lindsay's June, 2011 treating records also state that Plaintiff denied psychological symptoms (Tr. 311). Notes from the following month describe Plaintiff's anxiety as "stable" (Tr. 315). Dr. Magoon noted in June, 2012 that Plaintiff had done "quite well" on his medication regime of the past two years (Tr. 352-357) and in April, 2013 found that the psychological symptoms were "under good control with medication" (Tr. 368). The ALJ reasonably concluded that one therapist's finding of "marked" psychological limitation was contradicted by the bulk of the treating and consultative records (Tr. 26, 349). As such, the ALJ did not err by declining to find a greater degree of work-related psychological limitation.

### C. The Hypothetical Question and RFC (Argument 2)

Consistent with his argument regarding the psychological limitations, Plaintiff contends that the ALJ erred by omitting key limitations from the hypothetical question to the VE. *Plaintiff's Brief* at 12-13. Citing *Ealy v. Commissioner of Social Security,* 594 F.3d. 504, 516 (6th Cir. 2010), Plaintiff contends that the hypothetical restriction to unskilled work with only occasional interaction with others does not adequately address his moderate

-20-

limitation in concentration, persistence, or pace as found in the administrative decision. *Id.*

Plaintiff's argument is not well taken. First, the ALJ was not required include the phrase "moderate limitations in concentration, persistence, or pace" in the question to the VE. While "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments," it need not contain a laundry list of all of his particularized conditions. *Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 632 (6th Cir .2004) (*citing Varley v. Commissioner of Social Sec.*, 820 F.2d 777, 779 (6th Cir.1987)). Likewise, the ALJ was entitled to exclude a number of Plaintiff's professed but weakly supported limitations from the hypothetical question. *Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 118–119 (6th Cir.1994) (ALJ not obliged to include discredited allegations in the question to the VE).

Plaintiff argues specifically that the hypothetical modifier of "unskilled," with nothing more, does not address his moderate limitation in concentration, persistence, or pace. He is correct that a finding of moderate concentrational limitations is often coupled with the hypothetical modifiers such as "simple" and "routine." However, the ALJ's choice of the modifier "unskilled" and nothing more does not warrant remand in this case. "Unskilled work," standing alone, refers to the ability to understand, carry out, and remember "simple instructions." *Lewicki v. Commissioner of Social Sec.,* 2010 WL 3905375, *2 (E.D.Mich. September 30, 2010)(citing SSR 85–15, 1985 WL 56857, *4 (January 1, 1985). SSR 85-15 states that the "basic mental demands of . . . unskilled work include the abilities (on a

sustained basis) to understand, carry out, and remember *simple* instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a *routine* work setting." *Id.* (Emphasis added).  Thus, the ALJ's restriction to unskilled work, under SSR 85-15,  implies that the work is also "simple" and "routine." *Id.*  As such, the hypothetical restriction to unskilled work (also implying that the work is "simple" and "routine") is not inconsistent with the ALJ's finding that Plaintiff experienced moderate concentrational problems (Tr. 21, 25, 471).

Case law from the Sixth Circuit and this district suggests that the modifiers of simple, routine, and unskilled are sufficient to account for moderate concentrational difficulties. *Smith–Johnson v. Commissioner of Social Sec.*, 579 Fed. Appx. 426, 437,  2014 WL 4400999, *10 (6th Cir. September 8, 2014)(moderate concentrational limitations in carrying out detailed instructions and maintain attention and concentration for extended periods adequately addressed by restricting the claimant to unskilled, routine, repetitive work); *Despain v. Commissioner of Social Sec.,* 2014 WL 6686770, *12 (E.D.Mich. November 26, 2014)(same); *Lewicki,* 2010 WL 3905375, *2 (E.D.Mich. Sept.30, 2010)(the modifiers of "simple routine work" adequately accounted for the claimant's moderate concentrational deficiencies).

Moreover, the appropriate hypothetical modifiers for moderate concentrational difficulties can vary depending on the facts of the individual case.  *See Schalk v. Commissioner of Social Sec.,* 2011 WL 4406824, *11 (E.D.Mich. August 30, 2011)("no

bright-line rule" that moderate concentrational deficiencies require the inclusion of certain hypothetical limitations)(*citing Hess v. Comm'r of Soc. Sec.,* No. 07–13138, 2008 WL 2478325, *7 (E.D.Mich. June 16, 2008). While Plaintiff relies on *Benton v. CSS,* 511 F. Supp 2d 842, 849 (E.D. Mich. 2007) for the proposition that moderate pacing limitations must be included in the hypothetical modifiers. However, in this case, the transcript does not support the inclusion of additional limitations. The evidence shows that Plaintiff exaggerated his limitations and that his psychological limitations were successfully controlled with medication. While Plaintiff also cites *Ealy*, *supra,* to support his argument that the hypothetical did not address his full degree of concentrational limitation, *Ealy* does not hold that the terms "unskilled," "simple,""routine" or similar descriptives are intrinsically inadequate to address moderate concentrational deficiencies. Rather, the *Ealy* Court determined that the hypothetical limitations of "simple, repetitive" (drawn from a non-examining medical source) impermissibly truncated the source's conclusion that the claimant should be limited to "simple repetitive tasks to '[two-hour] segments over an eight-hour day where speed was not critical.'" *Id.*, 594 F.3d at 516.

The ALJ's succinct but adequate hypothetical question to the VE is supported by numerous portions of the record. While Plaintiff alleged that his psychological problems kept him virtually housebound his entire adult life, he reported that he had fathered two now-adult children and that he had recently married someone he met at church (Tr. 39). Plaintiff's report that he "took care" of his elderly mother (Tr. 259) and that he was able to drive

without apparent problems (Tr. 36) undermines his professed degree of limitation as a result of bipolar and OCD.  Notably, while Plaintiff did not work for his entire adult life due to the alleged mental conditions, he was not motivated to seek psychological help until anticipating lifestyle changes due to his mother's impending move into assisted living  (Tr. 264).

Because the determination that the Plaintiff was not disabled  is generously within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## VI.   CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate

Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: January 31, 2016

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on January 31, 2016, electronically and/or by U.S. mail.

s/C. Ciesla
Case Manager